| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFF **KRS FORT WORTH, LLC and WEST WHARTON HOSPITAL DISTRICT** | DEFENDANTS **UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES, THROUGH ITS SECRETARY, XAVIER BECERRA** |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.) JEFF CARRUTH (TX SBN: 24001846) 2608 Hibernia, Suite 105 Dallas, TX 75204-2514 Telephone: (713) 341-1158 Fax: (713) 961-5341 jcarruth@wkpz.com | **ATTORNEYS** (If Known) WHITNEY THARPE (TX SBN: 24064914) Assistant United States Attorney 110 N. College Street; Suite 700 Tyler, Texas 75702 Whitney.Tharpe@usdoj.gov Telephone: (903) 590-1400 Facsimile: (903) 590-1436 |
| **PARTY** (Check One Box Only) ☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor  ☐ Other ☐ Trustee | **PARTY** (Check One Box Only) ☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor  ☐ Other ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUES INVOLVED)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) - Recovery of Money/Property**
[ ] 11-Recovery of money/property - §542 turnover of property
[ ] 12-Recovery of money/property - §547 preference
[ ] 13-Recovery of money/property - §548 fraudulent transfer
[ ] 14-Recovery of money/property - other

**FRBP 7001(2) - Validity, Priority or Extent of Lien**
[ ] **21-Validity, priority or extent of lien or other interest in property**

**FRBP 7001(3) - Approval of Sale of Property**
[ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) - Objection/Revocation of Discharge**
[ ] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) - Revocation of Confirmation**
[ ] 51-Revocation of confirmation

**FRBP 7001(6) - Dischargeability**
[ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
[ ] 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
[ ] 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) - Dischargeability (continued)**
[ ] 61-Dischargeability - §523(a)(5), domestic support
[ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
[ ] 63-Dischargeability - §523(a)(8), student loan
[ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
[ ] 65-Dischargeability - other

**FRBP 7001(7) - Injunctive Relief**
[ ] 71-Injunctive relief - imposition of stay
[X] 72-Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
[ ] 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
[ ] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
[ ] 01-Determination of removed claim or cause

**Other**
[ ] SS-SIPA Case - 15 U.S.C. §§78aaa et.seq.
[X] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

☐ Check if this case involves a substantive issue of state law   ☐ Check if this is asserted to be a class action under FRCP 23

| ☐ Check if a jury trial is demanded in complaint | Demand $ |
|---|---|
| Other Relief Sought:  . | |

| **BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES** | | |
|---|---|---|
| NAME OF DEBTOR<br>REMARKABLE HEALTHCARE, LLC | BANKRUPTCY CASE NO.<br>24-40605<br>Jointly administered | |
| DISTRICT IN WHICH CASE IS PENDING<br>EASTERN | DIVISION OFFICE<br>SHERMAN | NAME OF JUDGE<br>**BRENDA T. RHOADES** |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>_/s/ Jeff Carruth_ | | |
| DATE<br>**April 18, 2024** | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Jeff Carruth (TX SBN: 24001846) | |

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **REMARKABLE HEALTHCARE OF** | § | **24-40605** |
| **CARROLLTON, LP, et al.** | § | **(Ch. 11)** |
| | § | |
| **DEBTORS.** | § | |
| | § | **Jointly Administered** |
| | § | |
| **KRS FORT WORTH, LLC AND WEST** | § | |
| **WHARTON HOSPITAL DISTRICT** | § | |
| | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | **Adv. Proc. No. _____** |
| **vs.** | § | |
| | § | |
| **UNITED STATES DEPARTMENT OF** | § | |
| **HEALTH & HUMAN SERVICES,** | § | |
| **CENTERS FOR MEDICARE &** | § | |
| **MEDICAID SERVICES, THROUGH** | § | |
| **ITS SECRETARY, XAVIER BECERRA** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT, APPLICATION FOR INJUNCTION AND EX PARTE TEMPORARY RESTRAINING ORDER,**

TO THE HONORABLE BRENDA T. RHOADES, CHIEF U.S. BANKRUPTCY JUDGE:

Pursuant to Fed. R. Civ. P. 65, Plaintiffs, KRS FORT WORTH, LLC ("KRS") and West Wharton Hospital District ("WWHD"), file their *Original Complaint and Application for Injunction and Ex Parte Temporary Restraining Order.* Plaintiffs would respectfully show to the Court the following.

# I.

## NATURE OF CASE

1.     This is an action for temporary restraining order and for an injunction, asking this Court to direct the United States Department of Health & Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS") to refrain from terminating the Medicare/Medicaid agreement for Remarkable Health Care of Fort Worth ("Remarkable"), which is set to occur on April 18, 2024.  Plaintiff will show that termination on April 18 is not in the best interest of the facility's residents; that the potential termination is causing undue stress for facility residents; and that the termination should be delayed until such time as a Change of Ownership ("CHOW"), which was formally requested on March 1, 2024, can be completed. Plaintiff will show that the termination date of April 18 is not legally warranted; there is no agency review for this type of action; and Plaintiff and its residents will suffer irreparable injury and loss if HHS and CMS are not enjoined from further illegal or unjustified acts.

2.     Plaintiffs disclose that they have filed a companion action on April 17, 2024 in the Northern District of Texas, Case No. 4:24-CV-00337-0.  The District Court denied the ex parte TRO request citing a lack of notice to HHS-CMS.  *See* Order, Docket No. 4.[1]  Although Plaintiffs have filed a Rule 60 motion on April 18, 2024 to seek reconsideration of the ex parte TRO denial, the Plaintiffs file this action now in this Court because HHS-CMS has appeared in the underlying main case by the Notice of Appearance of Ms. Whitney Tharpe (main case, Docket No. 16), and because Ms. Tharpe has appeared with Ms. Ashley Fenton for HHS-CMS in one or more recent hearings, thus alleviating the notice issues and concerns.

---

[1] Courtesy copies of all items filed or entered in Case No. 4:24-CV-00337-0 are being provided to the Court.

3.      *If the Court is not inclined to grant an ex parte TRO, then the Plaintiffs request that the Court set an emergency hearing to consider the TRO. This Complaint and the Exhibits satisfy the requirements in the Local Rules for an emergency hearing.*

## II.

## PARTIES

4.      Plaintiff, KRS FORT WORTH, LLC, is a property management company headquartered in Fort Smith, Arkansas. KRS is the leaseholder/landlord of Remarkable and has been since 2022 (Ex. 2).

5.      Plaintiff, West Wharton Hospital District ("WWHD"), is a hospital district, which holds licenses for 32 nursing facilities and skilled nursing facilities throughout Texas. WWHD is the current license holder for Remarkable (Ex. 10).

6.      Defendant, United States Department of Health & Human Services ("HHS") is the governmental agency that administers the Medicare program, and which reimburses the State of Texas for payments made to nursing facilities under the State's Medicaid Program. The Centers for Medicare and Medicaid Services ("CMS") is the branch of HHS that oversees the Medicare and Medicaid program administration on behalf of HHS, and which has ultimate responsibility for the enforcement action at issue in this proceeding. Both HHS and CMS may be served by serving the United States Department of Health & Human Services Secretary, Xavier Becerra, at 200 Independence Avenue S.W., Washington, D.C. 20201, as well as United States Attorney General, Merrick Garland, United States Department of Justice, 950 Pennsylvania Avenue N.W., Washington, D.C. 20530. Service on Mr. Garland and Mr. Becerra is requested at this time.

7.      Further, pursuant to Fed. R. Civ. P. 4, since this action involves an agency of the United States government, service should also be directed to the Chief United States Attorney for

the Northern District of Texas, Leigha Simonton, 1100 Commerce Street, Third Floor, Dallas, TX 75242-1699, as well as Gerardo Ortiz, Division Director of CMS' Survey and Operations Group, 1301 Young Street, Room 106-900, Dallas, TX 75202. Service on Ms. Simonton and Mr. Ortiz is requested at this time.

## III.

## JURISDICTION

8.      This Court has jurisdiction over this action pursuant to Sections 105, 363, 365, and/or 1101 et seq. of the United States Bankruptcy Code, Title 11 of the U.S. Code, 11 U.S.C. §101 et seq. (the "Code" or "Bankruptcy Code"), and 28 U.S.C. §§157 and 1334.

9.      This matter constitutes a core proceeding under 28 U.S.C. §157(b).

10.      Venue is proper under 28 U.S.C. §§1408 and 1409.

11.      The Court has constitutional authority to decide this Motion and enter final orders under Stern v. Marshall, 564 U.S. 462 (2011) and its progeny.

12.      Federal subject matter jurisdiction also is present under pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because the dispute arises under the Constitution, laws and treaties of the United States, specifically the federal Social Security and Medicare Acts, as well as the due process clauses of the U.S. Constitution.

13.      Federal subject matter jurisdiction also is present under pursuant to 28 U.S.C. 1331 because agency review procedures do not provide for review of the agency action in question.

## IV.

## BACKGROUND FACTS

14.      As outlined above, Remarkable is a skilled nursing facility (nursing home) licensed by the Texas Health & Human Services Commission ("HHSC") located in Fort Worth,

Texas.  Remarkable is licensed and certified to participate in both the State Medicaid program and the Federal Medicare program.  Remarkable's residents depend heavily on Medicare and Medicaid funding, as these programs provide the primary payor source for many of the residents at the facility.

15.     As of 3/1/24, papers were filed with HHSC to change ownership of Remarkable from Lori Beth and Jon McPike (the "McPikes") to WWHD under the Texas Quality Incentive Payment Program ("QIPP") (Ex. 10).    QIPP facilities, which receive more favorable reimbursement than non-QIPP homes, must meet certain quality standards set forth by HHSC in order to participate in this program.  When facilities participate in QIPP, the facility partners with a local hospital district to effectuate the QIPP program.  Under QIPP, the hospital is the license holder (approved by the State of Texas), but the day to day operations of the nursing home are conducted by nursing home staff, not the hospital district (Ex. 10).  In this case, Remarkable's QIPP partner is WWHD, but its day to day operations relevant to the enforcement action in question were conducted by the McPikes.

16.     With respect to KRS, this entity is a property management company which purchased the building where Remarkable operates in 2022 (Ex. 2).  When KRS purchased this property, it also acquired an interest in the facility's license (Ex. 2).[2] KRS also assumed and was assigned the rights to a 20-year lease, which the McPikes entered in 2010 with their prior landlord (Ex. 2).  Under the existing lease, the McPikes had been operating Remarkable since 2010 (Ex. 2). Since at least the Fall of 2023, KRS has been attempting to remove the McPikes as

---

[2] As will be discussed in more detail below, KRS acquiring an interest in Remarkable's license gives KRS standing in this case as a third-party beneficiary of the Medicare and Medicaid contracts between HHSC, CMS, and the facility. As the current/prospective license holder under the CHOW, WWHD is also a third-party beneficiary under these agreements (Ex. 10).  More specifically, under the CHOW, WWHD will be accepting an assignment of the current Medicare/Medicaid provider agreement, so termination of that agreement unquestionably affects WWHD's rights.

operator (for a variety of reasons including failure to pay rent, failure to honor the terms of the lease agreement, and concerns regarding the quality of care being provided at the facility). KRS' plan was to lease the facility to a new operator who could improve the quality of care provided at the facility.

17.     Unfortunately, the McPikes filed for bankruptcy multiple times during late 2023-early 2024. As such, any action against the McPikes by KRS (including an action to terminate their lease and install a new operator) was subject to the bankruptcy automatic stay.[3] Just within the last few weeks, KRS obtained an order from the bankruptcy court to lift the stay to allow it to proceed with terminating the McPikes' lease and installing a new operator. Multiple hearings regarding KRS' efforts in this regard have been held before the bankruptcy court. HHS and CMS have had full knowledge of these proceedings via presence of their counsel during the bankruptcy hearings. To say that there is "a lot of water under the bridge" in the bankruptcy proceedings is an understatement.

18.     While the bankruptcy proceedings were pending, and while KRS was attempting to get permission to replace the McPikes, Remarkable underwent two state surveys – one in January 2024 and a follow-up in February 2024. As a licensed nursing facility, Remarkable is required to comply with various State and Federal regulations and statutes. To ensure compliance with these regulations, HHSC employs surveyors to conduct periodic inspections. Although these surveys are conducted by HHSC, they are conducted on behalf of both HHSC (which administers the Medicaid program) and CMS (which administers the Medicare program). At the conclusion of the surveys, HHSC determines whether deficiencies (meaning

---

[3] Had the McPikes not filed for bankruptcy, the underlying dispute between Remarkable and CMS would have never occurred because the McPikes would have been replaced as operators last year, and as will be discussed below, it is unlikely that the new proposed operator (Pure Health) would have encountered the same regulatory challenges as the McPikes (Ex. 4).

noncompliance with statutes/regulations) should be cited.  If a deficiency is cited, it is assigned a "level," as well as a "scope and severity" (Ex. 6).  The "levels" range from 1 to 4 (with 4 being the most severe) and the "scope and severity" can range from A to L (with L being the most severe) (Ex. 6).  Following standard annual nursing home inspections, many facilities receive deficiencies due to the way in which the surveys are conducted.  The question then becomes how severe the deficiencies are and at what level they are cited.

19.     According to the State Operations Manual, Level 1 deficiencies encompass scope and severity levels A, B, and C, which are actually considered to be in "substantial compliance" with the licensing regulations (Ex. 6).  No enforcement action (monetary fines, withholding payment of funds, etc.) can be imposed for Level 1 deficiencies.

20.     Level 2 deficiencies encompass scope and severity levels D, E, and F (Ex. 6).  When a facility is cited for a Level 2 deficiency, it means the facility is technically in violation of a licensing requirement, but the "violation" has not and is not likely to cause any of the residents harm (Ex. 6).

21.     Level 3 deficiencies encompass scope and severity levels G, H, and I (Ex. B).  When a facility is cited for a Level 3 deficiency, it means that a licensing violation has resulted in "actual harm" to the resident, but that harm has not placed the resident in immediate peril or jeopardy (Ex. 6).

22.     Level 4 deficiencies encompass scope and severity levels J, K, and L (Ex. 6).  These are the most serious deficiencies a facility may receive.  Citation of a Level 4 deficiency means the facility's noncompliance could place one or more residents in "immediate jeopardy" ("IJ") of serious bodily injury if the harm is not immediately remedied (Ex. 6).  If an IJ situation

is declared during a survey, **the survey does not conclude until the immediate threat has been completely removed**.

23.     When HHSC cites deficiencies, the agency has the option of imposing enforcement action itself or referring the matter to CMS for imposition of enforcement remedies, ranging from monetary fines, to denial of payment for new admissions, to termination of the facility's Medicare and/or Medicaid provider agreements, and, if the deficiencies are severe enough, HHSC and/or CMS can recommend closure of the facility and loss of the facility's license to operate. *See* 42 CFR §§ 488.406(a)(4)(5) and (b)(5)(6).  With the exception of monetary fines, most enforcement actions do not begin until the facility has had at least one opportunity to "correct" or "clear" the cited deficiencies on a follow-up survey.

24.     As outlined above, on January 29, 2024, HHSC completed a survey at Remarkable and cited one Level G, one Level E, and one Level D deficiency (Ex. 1).  CMS did not initially impose any penalties at all related to the January 29 survey (Ex. 1). Then, on February 12, 2024, a second survey was completed, this time resulting in 3 citations at the IJ level (one Level J and two Level Ks) (Ex. 1).  Again, any time an IJ situation is identified during a survey, the survey does not end until the immediate threat is removed via a facility plan of removal which must be approved by the program manager for the HHSC region conducting the survey.  As such, it is undisputed that any immediate threat that may have existed during the February 12 survey was removed before the surveyors exited.

25.     While these surveys were occurring, KRS was working diligently to terminate the McPikes' lease so that a new operator could be hired (Ex. 4).  As outlined above, it was only a few weeks ago that the bankruptcy court lifted the automatic stay, which will now allow that to occur (Ex. 4).  HHS and CMS lawyers participated in the bankruptcy hearings and interacted

with KRS bankruptcy counsel in both recent bankruptcy cases.  As such, HHS and CMS knew that KRS was working to terminate the McPikes' lease and to install a new operator as soon as possible (Ex. 4).

26.    Despite knowing that change of ownership documents had been submitted to HHSC (turning over the license to WWHD) on 3/1/24, and despite knowing KRS was working to place a new operator in Remarkable, on April 3, 2024 without notice to either WWHD or KRS, CMS notified Remarkable that it planned to terminate the facility's provider agreement on April 18, 2024 (Ex. 1).[4]  WWHD and KRS did not learn about the proposed April 18 termination until learning about it from a third-party on the evening of April 10, 20204.  On April 10, also without notice to WWHD or KRS, HHSC surveyors (apparently acting on behalf of the state and CMS) reportedly arrived at Remarkable and instructed the facility that it had to close on April 18 (due to termination of the provider agreement) and that the facility had to tell all of the residents they had to move (Ex. 5, 11).  As will be discussed below, notwithstanding that Remarkable is not required to close just because its provider agreement is terminated, the termination/relocation news has caused undue emotional stress and harm to the facility residents (Ex. 5, 11).

27.    KRS and WWHD have tried everything in their power short of filing this action to resolve the termination issue, but to no avail.  CMS counsel advised the undersigned counsel on the morning of April 12, 2024 that CMS was unwilling to reach any agreement to extend the termination deadline.  See Ex. 15 ("CMS has indicated to HHS/OGC that the decision to terminate the provider agreements will

---

[4] The April 3, 2024 CMS letter was sent only to the facility address (Ex. 1).  WWHD, as the current (albeit temporary) license holder and entity which would be assuming the provider agreement under the CHOW did not receive notice until the CMS letter was forwarded to WWHD by KRS' counsel after KRS received it approximately one week later.

not be reversed.")  This was after CMS counsel refused to identify or to add to two lengthy video conference calls on 4/11/24 the CMS officials responsible for making the termination decisions. As such, KRS and WWHD have been left with no option other to bring this lawsuit seeking extraordinary relief for which neither State nor Federal agencies provide an avenue of appeal.

## VI

## FAST TRACK PROVIDER AGREEMENT TERMINATION IS NOT IN THE RESIDENTS' BEST INTEREST OR IN ACCORDANCE WITH CMS POLICY

28.      Due process rights attach when enforcement action is taken against nursing facilities or those in contractual privy with them.  When CMS notified Remarkable on April 3 that its provider agreement was being terminated on April 18, it offered the facility <u>only</u> the option to appeal the underlying findings of noncompliance that led to the proposed termination (but not the termination itself), and the appeal deadline for the alleged noncompliance is not until June 2, 2024 (Ex. 1).  It is nonsensical to offer appeal rights related to remedies arising out of an enforcement action, but yet take the proposed enforcement action nearly two months prior to the appeal date and certainly well in advance of any resolution of the underlying deficiencies.

29.      Further, even if the above discrepancy between the appeal date and the date for termination did not exist, CMS still should not be allowed to terminate Remarkable's provider agreement on April 18 because proper notice was not provided.  42 CFR § 488.456(c)(2) specifically states that if a facility's provider agreement is going to be terminated, proper notice must be provided by both CMS and the State – to both the facility and to the public.  To date, Remarkable has not been provided written notice of termination by the state.  KRS and WWHD have likewise not been provided any such notice.  This is significant, and is not a failure that can be overlooked, because the Medicaid provider agreement belongs to the state, while the federal agreement (regarding Medicare) belongs to CMS/HHS.

30.     Similarly, neither HHSC nor CMS have the authority to engage in conduct such as telling residents Remarkable is closing or that they have to move.  *If* Remarkable loses its provider agreement, at most that means the facility cannot bill for residents who receive Medicare or Medicaid funds.  It does not mean private pay residents or residents with private long term care insurance cannot remain at the facility.  It also does not mean that the owner/operator of Remarkable cannot reach agreements with its residents to remain at the facility while the new operator attempts to get the provider agreement reinstated/termination issues resolved.  The discharge/transfer provisions of the Social Security Act (which supersede any agency rule or regulation) do not list termination of a facility's provider agreement as a basis for transferring/discharging a resident.  Instead, the Social Security Act states that a resident may require transfer if the facility is closed.  *See* 42 U.S.C. § 1819(c)(2)(A)(6).  Even HHSC representatives confirmed, contrary to what their surveyors and CMS' agents advised the facility, that Remarkable had not been and was not being closed by the state (Ex. 5).

31.     Finally, CMS' policy, even in cases where IJ citations are present, is to allow facilities at least 6 months from the survey date prior to proposed termination (Ex. 7).  Exhibit 7 contains 38 CMS notice letters in KRS counsel's active cases in which IJ citations were present (some also in Special Focus Facilities which require more recent surveys due to poor compliance histories).  ***None of these letters reference a 15-day proposed termination period as was issued here*** (Ex. 7).  To allow CMS to arbitrarily impose 15-day "fast track" termination in one case, while failing to do it in similar cases results in an arbitrary, capricious enforcement process that does not benefit anyone, especially not the residents whom the survey process is allegedly designed to protect (Ex. 11).

32.     KRS, WWHD, and their counsel are cognizant of the general rule that requires facilities to challenge agency findings (and related enforcement actions) regarding Medicare/Medicaid through agency channels.   However, the United States Supreme Court recognizes that judicial review is available if agency review procedures preclude or do not provide for review of the agency action in question.  *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 19-20 (2000) (citing *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986)); *see also* Temporary Restraining Order entered by Hon. Robert Junell in Case No. 10-CV-103 (U.S. District Court for the Western District of Texas), *Manor Park, Inc. v. U.S. Department of Health & Human Services* (Ex. 9).  In the present case, the CMS notice letter regarding termination of the provider agreement states that Remarkable is entitled to appeal (through agency channels) the findings of noncompliance which led to the proposed enforcement action (which Remarkable will do), but CMS explains that Remarkable ***cannot appeal the enforcement action (termination of the provider agreement) itself*** (Ex. 1 p. 2). Therefore, Remarkable falls into the judicial review exceptions created by *Illinois Council* and *Michigan Academy*, just as Judge Junell properly recognized in the *Manor Park* case regarding the denial of payment remedy.

## VI.

## REQUEST FOR DECLARATORY RELIEF

33.     Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, KRS and WWHD ask this Court to declare their rights under the statutes and regulations contained in the Medicare and Social Security Acts, as well as under the Due Process Clauses of the U.S. Constitution in terms of the notice required for a federal regulatory enforcement action and circumstances under which fast track termination is warranted.  KRS and WWHD also ask this Court to impose an equitable

award of attorneys' fees to compensate KRS and WWHD for having to prosecute this action and

to deter HHS and CMS from imposing unauthorized, arbitrary enforcement actions in the future.

## VII.

## IRREPARABLE HARM IF ACTIONS NOT RESTRAINED

34.     Remarkable (along with KRS and WWHD) and its residents have suffered and

will continue to suffer irreparable harm if CMS and HHS' illegal actions are not restrained (Ex.

11).  Remarkable depends heavily on Medicare and Medicaid funding as a payor source for its

residents (Ex. 4, 11).  Without Medicare and Medicaid funding, it will be difficult for many

residents to be able to get the care which they desperately need (Ex. 4, 11).  As each day passes,

and such payments are disallowed, this endangers the safety and well-being of residents who

need care that they cannot otherwise afford or obtain (Ex. 11).  Further, many of the residents in

question require specialized skilled services that, according to Remarkable's attorney, are not

available at other facilities in the Fort Worth area (Ex. 8, 11).

35.     More specifically, Remarkable services nine large hospitals who discharge a high

quantity of patients needing skilled nursing care each month (Ex. 8). Therefore, both the

community of Fort Worth—which, according to the Texas Demographic Center, has a

population of 967,457—and the government need this Facility to remain open (Ex. 8).

36.     Remarkable accepts higher acuity patients (patients whose condition is severe and

imminently dangerous) than many other nursing homes, including being the only facility in Fort

Worth that accepts patients with *candidas auris*, a fungal "super bug" which may accompany

nursing home residents who admit directly from hospitals (Ex. 8).  This Facility is also one of the

very few that accepts geriatric-psychiatric patients—these patients, specifically, have been

kicked out of and/or denied by other facilities due to the erratic and hard-to-manage behaviors

associated with dementia and late-life depression and psychosis (Ex. 8).  The Fort Worth Facility

has successfully managed these geri-psych patients' behaviors, focusing on each person's individual needs, resulting in them thriving under Remarkable's care, according to their attorney (Ex. 8). The City of Fort Worth needs this Facility to stay open to treat, care for, and rehabilitate these high acuity and high risk patients and residents (Ex. 8, 11).

37.    Moving residents into and between nursing homes is a traumatic phenomenon, which frequently results in a condition known as Relocation Stress Syndrome/Transfer Trauma, or "RSS" (Ex. 3, 11).  According to the *Journal of Psychosocial Nursing and Mental Health Services and the National Institutes of Health*, seniors with anxiety, pain, PTSD, and general health problems, as well as those with pre-existing health conditions are prone to RSS (Ex. 3). RSS commonly results in the following psychological complications:

- Anger;
- Anxiety;
- Apprehension;
- Confusion;
- Hopelessness;
- Dependency;
- Depression;
- Insecurity;
- Loneliness; and
- Withdrawal.

38.    (Ex. 3).  RSS also frequently causes the following physiological problems in addition to the psychological problems outlined above:

- Body aches;
- Falls;
- Headaches;
- Stomach problems; and
- Unhealthy weight change.

(Ex. 3).  Studies have also shown that transfer trauma is further magnified or compounded for individuals with dementia, which is a diagnosis for a large part of Remarkable's population (Ex. 3; *see also* Ex. 11 affidavit from Larry McAfee regarding his wife, Sarah McAfee).  In a study

conducted in 2023, AARP found that half of the residents involuntarily transferred from a small nursing home in Virginia were dead in less than a year (Ex. 3)

39.     As applied in this case, this court need look no further than the April 11, 2024 media story which aired on Fort Worth affiliate WFAA regarding the proposed termination at Remarkable (Ex. 5).  Remarkable resident, Nona Taggart, who agreed to be interviewed on air for the WFAA story, epitomizes the symptoms of transfer trauma, or RSS, from which she is already suffering (Ex. 5, 11).  Ms. Taggart explained that Remarkable is her home (Ex. 5, 11). Despite some of the facility's regulatory challenges, the staff are her family, and she is depressed/heartbroken about possibly having to move (Ex. 5, 11).  Allowing CMS to proceed with the proposed termination on April 18, instead of extending it for a few months to allow Remarkable's new management to "turn the facility around" will cause residents like Nona Taggart to suffer irreparable harm (Ex. 11).  The same is true for the other facility residents, a sampling of whom have signed affidavits detailing the irreparable harm that they will suffer if CMS' proposed action goes forward (Ex. 11).  Therefore, in order to prevent further irreparable harm to Remarkable and its residents, Remarkable asks this Court to enjoin HHS and CMS from implementing unlawful, unjustified enforcement actions such as the Medicare/Medicaid provider agreement termination proposed here.

## VII.

## CONCLUSION

40.     KRS and WWHD recognize that agencies like CMS and HHS serve an important public function -- providing regulatory oversight for nursing homes which care for one of the most vulnerable segments of our population.  To that end, KRS and WWHD strive to partner with operators and entities that provide quality care to its residents.  These entities have been trying for months to install an operator that can permanently correct the regulatory issues that

may have existed at Remarkable. Their efforts, however, were thwarted until just recently by the bankruptcy proceedings. Both HHS and CMS are well aware of the efforts expended by KRS and WWHD, and they know the caliber of operator (in Pure Health) that KRS has made arrangements to install. Nevertheless, without any justification, CMS/HHS have refused to work with KRS and WWHD to extend the termination date to allow for completion of the CHOW/ownership change process. The proposed April 18, 2024 fast track provider agreement termination does not serve any legitimate public interest, and it potentially will cause irreparable harm to Plaintiffs, as well as to Remarkable's residents like Nona Taggart and the others outlined in Exhibit 11. There are no outstanding deficiencies at the immediate jeopardy level, and there is no current immediate threat to any of Remarkable's residents. Extending the termination period (which is not legal for the reasons outlined above) until the nursing home and its new operator (which was installed one day ago) have had the opportunity to assume full ownership and operational control to steer this facility back on track will not harm any resident, and it will not harm CMS. Conversely, cutting off the facility's ability to operate will do harm that cannot be repaired. It is not CMS' policy to issue 15-day termination directives, even in cases with IJ citations, and no such directive should have been issued here, particularly since the state survey agency did not provide Remarkable or its license holders with the notice required by law. There is no state or federal administrative agency appeal that affords the ability to even ask for the relief sought here, and the April 3, 2024 CMS notice letter confirms this. Consequently, this court should grant the extraordinary relief sought in this Complaint.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs, KRS and WWHD, pray this Court will grant a temporary restraining order prohibiting HHS, CMS, and any party in concert with them (including but not limited to HHSC) from terminating Remarkable's Medicare and/or

Medicaid provider agreement on April 18, 2024.  Plaintiff also prays that to the extent Plaintiffs'

request for relief cannot be heard prior to April 18, the Court will order Remarkable's Medicare

and Medicaid provider agreement reinstated as of the date of termination.  Plaintiffs pray that

this Court will set Plaintiffs' injunctive relief request for hearing, and after hearing, enjoin HHS

and CMS from the acts set forth above.  Plaintiffs also pray for all such other and further relief

(including attorneys' fees and court costs), general or special, legal or equitable, to which they

may be justly entitled.

*{continued on following page }*

Dated:  April 18, 2024                    Respectfully submitted:


                                          BEST & SPRUILL, P.C.

                                          By:   _/s/ Allison L. Spruill*_____
                                                ALLISON L. SPRUILL (TX SBN: 00789644)
                                                6805 N. Capital of Texas, Suite 330
                                                Austin, TX 78731
                                                Telephone: (512) 257-2104
                                                Email:  allison@bestandspruill.com

                                          -and-

                                          WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

                                          By:   _/s/ Jeff Carruth_____
                                                JEFF CARRUTH (TX SBN:. 24001846)
                                                24 Greenway Plaza, Suite 2050
                                                Houston, Texas 77046
                                                Telephone: (713) 341-1158
                                                Fax: (713) 961-5341
                                                E-mail:  jcarruth@wkpz.com


                                          ATTORNEYS FOR
                                          KRS FORT WORTH LLC, PLAINTIFF

                                          REED, CLAYMON, MEEKER, KRIENKE &
                                          SPURCK, PLLC

                                          By:   _/s/ Trent Kreinke*_____
                                                TRENT KREINKE (TX SBN: 24057951)
                                                5608 Parkcrest Drive, Suite 200
                                                Austin, Texas 78731
                                                Telephone (512) 660-5960
                                                Fax (512) 660-5979
                                          ATTORNEYS FOR
                                          WEST WHARTON HOSPITAL DISTRICT
                                          PLAINTIFF

                                          * Signature by permission by /s/ Jeff Carruth

## CERTIFICATE OF CONFERENCE AND ATTEMPTED NOTICE

I hereby certify that pursuant to Fed. R. Civ. P. 65(b)(1)(B), Plaintiffs have attempted to reach resolution with CMS regarding this matter without court intervention.  Specifically, on April 11, 2024 there were two conference calls with 17 individuals representing all parties in which the matters contained in this pleading were discussed.  No resolution was achieved, and on 4/12/24, Counsel for HHS notified the undersigned counsel that no agreement would be reached. Counsel for CMS/HHS are being provided courtesy copies of this pleading at the time it is filed, although KRS and WWHD do not know whether the lawyers with whom they have been dealing are the lawyers who will represent CMS/HHS in this proceeding.  CMS/HHS Counsel were advised on 4/11/24 that injunctive relief could be sought if a resolution was not reached.


/s/ Allison L. Spruill
ALLISON L. SPRUILL


## CERTIFICATE OF SERVICE

The undersigned certifies that this Motion and Docket Nos. Nos. 1-4 in this action were served on April 18, 2024 by direct email to the following attorneys representing HHS-CMS and/or Texas HHSC.

| | |
|---|---|
| Whitney Tharpe (HSS-CMS) | whitney.tharpe@usdoj.gov |
| Ashley Fenton (HSS-CMS) | ashley.fenton1@hhs.gov |
| Daniel Wolf (HSS-CMS)e | daniel.wolfe@hhs.gov |
| Tangla Fudge-Bernal (HSS-CMS) | tangla.fudge-bernal@hhs.gov |
| Christopher S. Murphy (Texas HHS) | christopher.murphy@oag.texas.gov |
| Layla D. Milligan (Texas HHS) | layla.milligan@oag.texas.gov |
| Sherri Simpson (Texas HHSC) | sherri.simpson@oag.texas.gov |


*/s/ Jeff Carruth*
Jeff Carruth


In addition, all registered ECF users in the main case, including Ms. Tharpe, received a copy of this Complaint immediately upon filing, as set forth in the ECF service list below.

/s/ Jeff Carruth
JEFF CARRUTH

# ECF NOTICE LIST

**24-40605 Notice will be electronically mailed to:**

Elizabeth Nicolle Boydston on behalf of Debtor Remarkable Healthcare of Carrollton, LP
lboydston@gutnicki.com

Elizabeth Nicolle Boydston on behalf of Debtor Remarkable Healthcare of Dallas, LP
lboydston@gutnicki.com

Elizabeth Nicolle Boydston on behalf of Debtor Remarkable Healthcare of Fort Worth, LP
lboydston@gutnicki.com

Elizabeth Nicolle Boydston on behalf of Debtor Remarkable Healthcare of Seguin, LP
lboydston@gutnicki.com

Elizabeth Nicolle Boydston on behalf of Debtor Remarkable Healthcare, LLC
lboydston@gutnicki.com

Lynn Hamilton Butler on behalf of Creditor Alleon Capital Partners, LLC
lynn.butler@huschblackwell.com,
penny.keller@huschblackwell.com;christine.deacon@huschblackwell.com;ryan.burgett@huschblackwell.com

Jeff Carruth on behalf of Creditor KRS Carrollton, LLC
jcarruth@wkpz.com,
jcarruth@aol.com;atty_carruth@trustesolutions.com;ATTY_CARRUTH@bluestylus.com;carruthjr87698@notify.bestcase.com

Jeff Carruth on behalf of Creditor KRS Dallas, LLC
jcarruth@wkpz.com,
jcarruth@aol.com;atty_carruth@trustesolutions.com;ATTY_CARRUTH@bluestylus.com;carruthjr87698@notify.bestcase.com

Jeff Carruth on behalf of Creditor KRS Fort Worth, LLC
jcarruth@wkpz.com,
jcarruth@aol.com;atty_carruth@trustesolutions.com;ATTY_CARRUTH@bluestylus.com;carruthjr87698@notify.bestcase.com

Jeff Carruth on behalf of Creditor KRS Seguin, LLC
jcarruth@wkpz.com,
jcarruth@aol.com;atty_carruth@trustesolutions.com;ATTY_CARRUTH@bluestylus.com;carruthjr87698@notify.bestcase.com

Jeff Carruth on behalf of Creditor Kilgore Property Management LLC
jcarruth@wkpz.com,
jcarruth@aol.com;atty_carruth@trustesolutions.com;ATTY_CARRUTH@bluestylus.com;carruthjr87698@notify.bestcase.com

Alejandra Garcia Castro on behalf of Creditor Alleon Capital Partners, LLC
alejandra.garciacastro@huschblackwell.com

Buffey E. Klein on behalf of Creditor Alleon Capital Partners, LLC
buffey.klein@huschblackwell.com, tanya.adams@huschblackwell.com;buffey-klein-8494@ecf.pacerpro.com

Aimee E. Marcotte on behalf of Creditor A Lawn and Landcare Services Company, LLC
amarcotte@popehardwicke.com

Christopher S. Murphy on behalf of Interested Party Texas Health and Human Services Commission
bk-cmurphy@oag.texas.gov, sherri.simpson@oag.texas.gov

Julie Anne Parsons on behalf of Creditor The County of Denton, Texas
jparsons@mvbalaw.com,
kalexander@mvbalaw.com;theresa.king@mvbalaw.com;julie.parsons@ecf.courtdrive.com

Julie Anne Parsons on behalf of Creditor The County of Guadalupe, Texas
jparsons@mvbalaw.com,
kalexander@mvbalaw.com;theresa.king@mvbalaw.com;julie.parsons@ecf.courtdrive.com

Harrison Pavlasek on behalf of Creditor Quatro Tax LLC
hpavlasek@forsheyprostok.com

Jeff P. Prostok on behalf of Creditor Quatro Tax LLC
jprostok@forsheyprostok.com,
lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;Calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com;khartogh@ecf.courtdrive.com;khartogh@forsheyprostok.com;forsheyprostokllp@jubileebk.net

Alexandria Rahn on behalf of Debtor Remarkable Healthcare of Carrollton, LP
arahn@gutnicki.com, docket@gutnicki.com;1694884420@filings.docketbird.com

Alexandria Rahn on behalf of Debtor Remarkable Healthcare of Dallas, LP
arahn@gutnicki.com, docket@gutnicki.com;1694884420@filings.docketbird.com

Alexandria Rahn on behalf of Debtor Remarkable Healthcare of Fort Worth, LP
arahn@gutnicki.com, docket@gutnicki.com;1694884420@filings.docketbird.com

Alexandria Rahn on behalf of Debtor Remarkable Healthcare of Seguin, LP
arahn@gutnicki.com, docket@gutnicki.com;1694884420@filings.docketbird.com

Alexandria Rahn on behalf of Debtor Remarkable Healthcare, LLC
arahn@gutnicki.com, docket@gutnicki.com;1694884420@filings.docketbird.com

Robert A. Simon on behalf of Creditor MedixCar LLC
rsimon@whitakerchalk.com, bpeck@whitakerchalk.com;acopeland@whitakerchalk.com

Whitney Tharpe on behalf of Creditor United States Department of Health and Human Services
whitney.tharpe@usdoj.gov, guadalupe.garcia@usdoj.gov

John Kendrick Turner on behalf of Creditor City of Carrollton
john.turner@lgbs.com, Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner on behalf of Creditor Dallas County
john.turner@lgbs.com, Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner on behalf of Creditor Lewisville ISD
john.turner@lgbs.com, Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John Kendrick Turner on behalf of Creditor Tarrant County
john.turner@lgbs.com, Dora.Casiano-Perez@lgbs.com;Dallas.Bankruptcy@lgbs.com

John M. Vardeman on behalf of U.S. Trustee US Trustee
john.m.vardeman@usdoj.gov

Mark A WEISBART (SBRA V)
mweisbart@haywardfirm.com,
tsimmons@haywardfirm.com;ecf.alert+Weisbart@titlexi.com

complaint HHS-CMS bk 001 4873-8498-6295 v.8.docx [3] 4886-5344-6071, v. 2